***********
The Full Commission reviewed the Order Approving Compromise Settlement Agreement, based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses and vacates the Deputy Commissioner's Approving Compromise Settlement Agreement and enters the following Opinion and Award.
 ***********
The Full Commission finds facts as following:
 FINDINGS OF FACT
1. This matter involves an injury by accident that occurred on October 15, 1998, when the Plaintiff was involved in a motor vehicle accident. The Defendants ultimately accepted compensability of the claim.
2. On August 11, 2003, a Mediated Settlement Conference was held in Asheville, North Carolina with Neil Fuleihan serving as the mediator. The parties negotiated a settlement of all the issues pertaining to the Plaintiff's workers' compensation claim, including a claim for attendant care benefits, for the amount of $753,605.00. The parties further agreed that this amount would be allocated as follows: (1) $300,000.00 to be paid in lump sum to the Plaintiff; (2) $300,000.00 to be paid into an annuity which would pay the Plaintiff for her lifetime with a fifteen year guarantee; (3) $3,605.00 to be put into a self-administered trust; and (4) $150,000.00 to be paid to Plaintiff's counsel in attorney's fees. This settlement was reduced to writing in a Mediated Settlement Agreement, which was executed by the Plaintiff, her husband, Plaintiffs counsel, a representative of the Carrier-Defendants and defense counsel.
3. The Mediated Settlement Agreement executed by the parties on August 11, 2003, complied with Rule 502 of the Workers' Compensation Rules of the North Carolina Industrial Commission. The Mediated Settlement Agreement was executed by all the parties at the conclusion of the mediation. The settlement terms were definite and specifically contained in the Mediated Settlement Agreement. In addition, the Mediated Settlement Agreement included language that the Plaintiff "shall execute all necessary Forms and/or a standard Compromise Settlement Agreement that complies with N.C.G.S. § 97-17." The Mediated Settlement Agreement states that "all medical expenses through the date of this agreement will be paid by the employer", and that the parties agreed that there was a need for finality in this litigation. In addition, the Mediated Settlement Agreement also stated that "[t]he parties and their respective attorneys acknowledge that all material terms are included in this agreement, that it is fair and in the best interest of all parties and consent to the Industrial Commission reviewing this Agreement and entering an Order approving a settlement agreement based upon the terms and conditions contained here."
4. On August 14, 2003, defense counsel forwarded the Final Compromise Settlement Agreement to Plaintiff's counsel for execution by the Plaintiff. Pursuant to the Plaintiff's request, the Final Compromise Settlement Agreement was signed by defense counsel with the understanding that it would be executed by the Plaintiff and her husband, and then presented to Deputy Commissioner Garner for review and approval.
5. In correspondence dated, August 21, 2003, Plaintiff's counsel informed defense counsel that his clients had changed their mind and decided not to execute the Final Compromise Settlement Agreement.
6. On August 28, 2003, defense counsel filed Defendant's Motionto Enforce Mediated Settlement Agreement with the Industrial Commission. An expedited hearing was scheduled to be heard by Deputy Commissioner Garner on September 13, 2003.
7. On September 13, 2003, the parties appeared before Deputy Commissioner Garner on the Defendant's Motion to Enforce theMediated Settlement Agreement. The Plaintiff was the only witness called to offer testimony at this hearing. Following the hearing, the parties submitted a complete set of the Plaintiff's medical records for Deputy Commissioner Garner's review.
8. On November 14, 2003, Deputy Commissioner issued an Order approving the Mediated Settlement Agreement entered into by the parties on August 13, 2003.
9. On November 19, 2003, the Plaintiff filed an appeal to the Full Commission of Deputy Commissioner Garner's Order approving the Mediated Settlement Agreement. On or about January 20, 2004, a Stipulation of Transcript of Evidence executed by the parties was submitted to the Industrial Commission.
10. This case arises from an extremely serious closed head injury which Mrs. Ross sustained on October 15, 1998 while driving her company car on N.C. Highway 1620 on her way to work at Ridgecrest Hospital which was located across the state line in Georgia. In spite of providing the company car and the accident occurring in North Carolina, defendants initially denied compensability on the basis that jurisdiction was proper in Georgia. After an initial hearing on May 12, 1999 before Deputy Commissioner Gamer, defendants abandoned their defense and accepted Mrs. Ross' claim as compensable and filed a Form 60, Admission of Employee's Right to Compensation. As a result of this injury Ms. Ross has suffered significant cognitive damage, short term memory loss, depression, anxiety; traumatic cataracts, headaches, neck pain, right knee pain, and facial and nasal injuries.
11. Thereafter, by Motion to Authorize filed June 24, 2001, plaintiff requested a hearing before Deputy Commissioner Gamer to obtain authorization for attendant care services being provided to Mrs. Ross by Mr. Ross which had been recommended by her treating physicians. Prior to resolution of this issue, Mrs. Ross was recommended to attend an inpatient neuropsychological head trauma treatment program at Peace Rehabilitation in Greenville, South Carolina. The parties entered into a Consent Order for Mrs. Ross' admission which provided for payment of 4 hours of attendant care, 7 days per week at a rate of $8.00 per hour.
12. Prior to admission to the Peace program, the parties further resolved the issue of payment of past due attendant care services due to plaintiff's husband, Gary Ross. By entry of an Order filed May 3, 2002, the parties agreed that Mr. Ross would be paid $80,000.00 for all past due attendant care services, and further agreed to pay Mr. Ross for 6 hours per day, 7 days per week of attendant care beginning May 4, 2002 at a rate of $10.00 per hour.
13. Mrs. Ross attended the Peace Rehabilitation program for 12 weeks of inpatient care from July 10 to September 27, 2002. Upon her discharge, the staff at Peace Rehabilitation recommended Mrs. Ross required 24 hours per day of attendant care. As a result of this recommendation, plaintiff filed a Motion to Authorize an increase of plaintiff's attendant care to 24 hours per day. Prior to ruling on this motion, the parties entered into an Interim Consent Order for defendant's to pay Mr. Ross attendant care for 16 hours per day, 7 days per week at rate of $10.00 per hour until the depositions of the Peace Rehabilitation staff and plaintiff's neurologist, Dr. Robert Armstrong, could be completed.
14. Upon completing the depositions, plaintiff renewed her motion to authorize 24 hour care which was supported by Dr. Armstrong and Peace Rehabilitation. Dr. Armstrong testified
 Q. Have you been able to form certain opinions on the extent of custodial care? By extent, I mean the number of hours per day or hours per week
 A. Basically, as far as — I think she does need around the clock supervision because of the problems with visual acuity. She's very predisposed to falls, which she's already had, and has difficulty carrying out just activities of daily living, cooking, meal preparation, things of that nature because of her low visual acuity; and then is added on to the additional difficulties she has with just her cognition and kind of slowness of thinking. . .
 Q. Have your opinions regarding the extent of custodial care changed in any way since we last deposed you in June of 2001?
 A. I think so. I think I feel — now that I've followed the case long, I feel more strongly that the 24-hour level of supervision and custodial care is needed for her. (Armstrong dep. pp. 8-9, emphasis added)
15. Defendants filed a Motion to Compel an IME pursuant to the Interim Consent Order requesting that Mrs. Ross undergo a new neuropsychological evaluation. Counsel for plaintiff responded by pointing Out plaintiff had undergone no less than 5 neuropsychological evaluations, the last of which was less than one year old, and further pointing out that Dr. Armstrong had testified that Mrs. Ross' cognitive condition had stabilized and not likely to show much change to make such further testing unnecessary.
16. By Order filed August 5, 2003, Deputy Commissioner Gamer authorized the increase in payment for attendant care services to 24 hours per day, 7 days per week in accordance with the testimony of Dr. Armstrong, and further denied Defendant's motion for a new neuropsychological evaluation.
17. The North Carolina Industrial Commission is the administrative agency of the State of North Carolina that administers the North Carolina Workers' Compensation Act. It has done so since the Act was first enacted in 1929. Compromise Settlement Agreements are an important part of the administration of the Workers' Compensation Act in that, nine times out of 10, they bring an end to contested cases.
18. The Industrial Commission is charged by statute and case law with determining whether a given compromise settlement agreement is "fair and just" and in the best interests of all of the parties thereto. The Industrial Commission uses a hierarchy of methods to make these determinations. (a) If a case has not been contested the Executive Secretary of the Industrial Commission ordinarily approves or disapproves of compromise settlement in the first instance, with right of internal review by the next level of the Industrial Commission. If the Executive Secretary made findings of fact and conclusions of law in the Order approving a given compromise settlement agreement, ordinarily the internal review is by a panel of the Full Commission on a regular appeal docket. If there are no findings of fact and conclusions of law, the matter is referred from the Executive Secretary to a Deputy Commissioner of the Industrial Commission to make a decision after a hearing. If timely review is sought, further internal review is by a panel of the Full Commission. (b) In contested cases that are still at the Deputy Commissioner level of the Industrial Commission, initial internal review of a compromise settlement agreement is by the Deputy Commissioner assigned to the case with internal review by a Panel of the Full Commission if timely appeal is made. (c) If a contested case has been appealed from the Deputy Commissioner level to the Full Commission level before a compromise settlement agreement is submitted for approval, ordinarily a single Commissioner makes the approval, with right of further internal review by a panel of three different Commissioners. It is important to note that, if timely internal review is sought, a panel of the Full Industrial Commission is and has been "the Industrial Commission" for purposes of final approval of a compromise settlement agreement. If no timely internal review is sought, the level making the approval is "the Industrial Commission" for purposes of final approval, whether it be the Executive Secretary, a Deputy Commissioner or a Commissioner.
19. In the instant case, the initial review was conducted by a Deputy Commissioner who had been assigned to the case. Timely internal review was sought of his decision. In this instance, "the Industrial Commission" has not completed its process pursuant to N.C. Gen. Stat. § 97-17 until the panel of the Full Commission assigned to review the Order of the Deputy Commissioner has issued its Order. This was the procedure in effect prior to the amendment of N.C. Gen. Stat. § 97-17 in 2001 and it has continued to be the procedure in effect after that amendment.
20. The "bluelined" differences between N.C. Gen. Stat. § 97-17
immediately prior to and immediately after the 2001 amendment are as follows: (Blue indicates changes from prior)
§ 97-17. Settlements allowed in accordance with Article.
Statute text
 (a) This article does not prevent settlements made by and between the employee and employer so long as the amount of compensation and the time and manner of payment are in accordance with the provisions of this Article. A copy of a settlement agreement shall be filed by the employer with and approved by the Commission. No party to any agreement for compensation approved by the Commission shall deny the truth of the matters contained in the settlement agreement, unless the party is able to show to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence or mutual mistake, in which event the Commission may set aside the agreement. Except as provided in this subsection, the decision of the Commission to approve a settlement agreement is final and is not subject to review or collateral attack.
 (b) The Commission shall not approve a settlement agreement under this section, unless all of the following conditions are satisfied:
 (1) The settlement agreement is deemed by the Commission to be fair and just, and that the interests of all of the parties and of any person, including a health benefit plan that paid medical expenses of the employee have been considered.
 (2) The settlement agreement contains a list of all of the known medical expenses of the employee related to the injury to the date of the settlement agreement, including medical expenses that the employer or carrier disputes, and a list of medical expenses, if any, that will be paid by the employer under the settlement agreement.
 (3) The settlement agreement contains a finding that the positions of all of the parties to the agreement are reasonable as to the payment of medical expenses.
 (c) In determining whether the positions of all of the parties to the agreement are reasonable as to the payment of medical expenses under subdivision (3) of subsection (b) of this section, the Commission shall consider all of the following:
 (1) Whether the employer admitted or reasonably denied the employee's claim for compensation.
 (2) The amount of all of the known medical expenses of the employee related to the injury to the date of the settlement agreement, including medical expenses that the employer or carrier disputes.
(3) The need for finality in the litigation.
 (d) Nothing in this section shall be construed to limit the application of G.S. 44-49 and G.S. 44-50 to funds in compensation for settlement under this section.
History
 (1929, c. 120, s. 18; 1963, c. 436; 2001-216, s. 2; 2001-487, s. 102(b).)
21. In administering the Act, the Industrial Commission has interpreted "the decision of the Commission to approve a settlement agreement" to be the internal decision of the Commission at the end of all internal review. In administering the Act, the Industrial Commission has interpreted "is final and is not subject to review or collateral attack" to mean review outside the Industrial Commission or review after right to internal review has been exhausted.
22. There is additional reason why internal review by a panel of the Full Commission is proper in the instant case. Deputy Commissioner Garner's Order Approving Compromise Settlement Agreement did not contain detailed findings of fact or conclusions of law. As such, under Rule 703 of the Workers' Compensation Rules of the Industrial Commission, it was an administrative decision subject to review if request is made within 15 days. Rule 703 provides, in pertinent part:
Rule 703. Review of Administrative Decisions.
 (1) Orders, Decisions, and Awards made in a summary manner, without detailed findings of fact, including Decisions on applications to approve agreements to pay compensation and medical bills, applications to approve the termination or suspension of compensation, applications for change in treatment or providers of medical compensation, applications to change the interval of payments, and applications for lump sum payments of compensation may be reviewed by filing a Motion for Reconsideration with the Industrial Commission and addressed to the Administrative Officer who made the Decision or may be appealed by requesting a hearing within 15 days of receipt of the Decision or receipt of the ruling on a Motion to Reconsider. These issues may also be raised and determined at a subsequent hearing.
23. Defendants timely provided the signed Compromise Settlement Agreement to plaintiff for signature on August 14, 2003. Subsequent to execution of the mediation agreement, Mrs. Ross determined that she required extensive additional medical treatment which had not been considered upon entering into the Mediation Agreement and declined to execute the Compromise Settlement Agreement.
24. On August 28, 2003, defendants filed a Motion to Enforce Mediated Settlement Agreement requesting the agreement be enforced based upon the Court of Appeals decision in Lemly v.Colvard Oil Co., 157 N.C. App. 99, 577 S.E.2d 712 (2003).
25. Due to the termination of plaintiff's benefits, an expedited hearing was held before Deputy Commissioner Gamer on September 15, 2003 to determine if the executed Compromise Agreement was enforceable pursuant to the Lemly decision, and if so, should such agreement be approved as fair and reasonable. At such hearing, Mrs. Ross testified that subsequent to discharge from Peace Rehabilitation she continued with medical care with Dr. Armstrong and Dr. Haynes but was unable to participate in the recommended psychological counseling at Peace Rehabilitation. She would see Dr. Haynes every 4-6 months and Dr. Armstrong every 4 months. She further reported that due to her visual problems she had fallen in January 2003 and sustained a fractured leg for which she received treatment by Dr. Eddings, an orthopedic surgeon in Asheville. According to Mrs. Ross, Dr. Eddings had recommended physical therapy which had not been authorized by defendant-carrier.
26. Mrs. Ross explained she was not at maximum medical improvement and required extensive additional medical treatment including plastic surgery to remove an overgrowth of tissue on her forehead and correct a deviated septum, and further evaluation of her right knee injury which had been denied by the carrier. She further reported that she may require further eye surgery to correct her traumatic cataract in her left eye. However, due to the complete loss of vision in her right eye, her doctor had previously been reluctant to undertake such surgery. She had also been recommended to attend adjustment training at the N.C Center for the Blind to assist with living skills for independent living.
27. Upon questioning from the deputy commissioner, Mrs. Ross indicated that due to these significant and costly future medical expenses, including her attendant care, she felt the agreement didn't reasonably and adequately provide for her needs and the agreement was unconcerned for her unknown future.
28. Upon hearing plaintiff's testimony regarding her needs for extensive future medical treatment and her apparent failure to attain MMI, Deputy Commissioner Garner indicated he felt it would be inappropriate to approve the agreement but indicated he required additional medical information from the doctors to say "she's at MMI now, and she's not going to get any worse or any better" so at this point I can't really say it's in the best interest of either side." He later added "I'm inclined to say the clincher is too early only because I'm concluding she's not at MMI." After considerable discussion of this issue Deputy Commissioner Garner declared:
 "I'm inclined to disapprove this clincher on the grounds that the claimant is so concerned about the unknowns. I don't have any evidence in front of me that the claimant is at MMI, and she's set forth several unknowns that she is concerned about, including two surgeries, one to the eye and one to the knee, and arthritis that has entered her body, and her need for . . . rehab at the school for the blind, rehabilitation for the blind, so in light of all those unknowns and concerns that she had, I'm going to disapprove this clincher."
29. Plaintiff was also evaluated by Dr. Ronald Lane on October 6, 2003 for "long history of headache and facial pain following a severe motor vehicle accident back in 1998." She was noted to have a deviated septum and congested turbinates. Dr. Lane reported "if anything the deviated septum and congested turbinates have worsened and recommended surgical correction for both conditions."
30. Mrs. Ross underwent further evaluation by Dr. Armstrong on October 16, 2003 with complaints of increasing low back pain which had begun after a fall in January 2003 which resulted in a leg fracture and which defendants had accepted as compensable. She was noted to have muscle spasm in her back and numbness in her arms. Dr. Armstrong recommended a new MRI examination and the possibilities of additional physical therapy. Dr. Armstrong also encouraged Mrs. Ross to follow up with Dr. Lane regarding the proposed surgery.
31. Based on the need for continuing medical treatment, plaintiff filed a Motion for Authorization of Ongoing Medical Treatment on October 31, 2003. Plaintiff further pointed out that Dr. William Haynes, plaintiff's long time treating neuro-opthamologist had recommended repair of her traumatic cataract in her left eye stating:
 Ms. Ross has now developed a cataract in her left eye which maybe related to the original trauma. She may need cataract surgery in that eye in the near future. I do not expect that Ms. Ross will get any improvement in vision over time in her right eye . . . there is always a possibility that things such as traumatic glaucoma could occur, even many years after the injury which may be still related to the original injury.
Plaintiff further pointed out that Dr. David Cappiello had recommended surgical correction of her right knee in1999 which had never been approved by defendants.
32. Subsequent to the hearing, defendants provided the deputy with additional medical records and argued such records supported the conclusion that plaintiff was at MMI and the clincher should be approved.
33. By Order dated November 14, 2003, Deputy Commissioner Gamer approved the Mediated Settlement Agreement finding the requirement of I.C Rule 502(3)(a) and N.C. Gen. Stat. § 97-17 had been satisfied and further finding the agreement "deemed by the Commission to be fair and just, and in the best interest of the parties." Plaintiff has given notice of appeal to the approval of this Order Approving Compromise Settlement Agreement on the basis that plaintiff had not yet reached maximum medical improvement, required extensive medical, surgical and attendant care services to such an extent that the amount provided for in the Mediated Settlement Agreement was not reasonably adequate to provide for Mrs. Ross' anticipated medical needs, and therefore, should not be approved as fair and reasonable.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. The Supreme Court has long held that the Industrial Commission, in its judicial capacity, must undertake a full investigation for determining whether or not a voluntary settlement is fair and just. "The law thus undertakes to protect the rights of the employee in contracting with respect to his injuries." The Court has affirmed this position stating "the Industrial Commission stands by to assure fair dealings in any voluntary settlement." Vernon v. Mabe Builders, 336 N.C. 425,444 S.E.2d 191 (1994); Biddix v. Rex Mills, 237 N.C. 660, 663,75 S.E.2d 777, 780 (1953).
2. In the present case, Deputy Commissioner Gamer heard the evidence at the hearing in September, heard the testimony of Mrs. Ross, considered the extent of her injuries and need for future medical care and declared:
 I'm inclined to disapprove this clincher on the grounds that the claimant is so concerned about the unknowns. I don't have any evidence in front of me that the claimant is at MMI, and she's set forth several unknowns that she is concerned about, including two surgeries, one to the eye and one to the knee, and arthritis that has entered her body, and her need for . . . rehab at the school for the blind, rehabilitation for the blind, so in light of all those unknowns and concerns that she had, I'm going to disapprove this clincher."(T.p. 70, emphasis added)
Subsequent to the hearing, the parties submitted additional medical records for further consideration of Mrs. Ross' need for continuing medical care, the recommendation for future surgeries and her failure to attain maximum medical improvement. Accordingly, when he was performing his thorough investigation of the reasonableness, Deputy Commissioner Gamer became aware that Mrs. Ross suffered not only significant cognitive deficits, brain damage, memory loss, depression and anxiety; but also suffered a severe loss in vision, which Dr. William Haynes' note of 10/27/03 indicated "her visual acuity was hand motions in the right eye and 20/60 in the left eye." Dr Haynes also noted "Ms. Ross has now developed a cataract in her left eye which may be related to the original trauma. She may need cataract surgery in that eye inthe near future." Dr. Haynes goes on to state "I do not expect that Ms. Ross will get any improvement in vision over time in her right eye . . . there is always a possibility that things such as traumatic glaucoma could occur, even many years after the injury which may be still related to the original injury."
Upon discharge from Peace Rehabilitation in September 2002, Mrs. Ross had been recommended to continue psychological counseling and also to attend the adjustment training at the N.C Center for the Blind, and still requires completion of these treatments. Accordingly; it was obvious Ms. Ross has very serious visual problems that continue to require treatment, including surgery and training in the future for which there is a complete lack of adequate information to fully investigate and evaluate whether the settlement adequately or reasonably provides for such needs.
In addition, Mrs. Ross has ongoing problems with headaches, congestion, and nasal problems related to the injury as reported by Dr. Ronald Lane. Dr. Lane has indicated "I have also reevaluated her nose and found that, if anything, the deviated septum and congestion turbinates has worsened. I would recommend that we straighten the septum cartilage and trim the inferior turbinates as well as removal with soft tissue mass from her nasopharynax."
Mrs. Ross suffered an injury to her right knee and was diagnosed with a meniscus tear by Dr. David Cappiello. Unfortunately, the insurance carrier never authorized treatment for this problem and Ms. Ross was never able to obtain further evaluation, treatment or possible surgical repair. Accordingly; if such treatment had been denied she could not have obtained maximum medical improvement from this condition. Nor was the deputy able to fully investigate the extent to which she required additional care or surgery.
Finally, Ms. Ross has developed increasing neck problems with significant muscle spasms for which she has recently undergone MRI scans by Dr. Robert Armstrong, her authorized treating neurologist. In light of these worsening neck and back problems, further evaluations and treatment are necessary to permit Mrs. Ross and Deputy Commissioner Garner sufficient information to investigate and determine her future medical needs. However, the Mediated Settlement Agreement was approved prior to such information being made available.
In light of the known ongoing severe medical conditions and the Deputy's failure to order further medical evaluations as recommended by Mrs. Ross' physicians, there was a complete lack of adequate information upon which the Deputy could rely to determine the medical needs or costs reasonably necessary. Therefore, there could be no way for him to complete the thorough evaluation which the law requires and the agreement should be set aside on this basis. Given the multitude of physical problems that Ms. Ross continues to suffer from, the Full Commission finds Mrs. Ross has not reached maximum medical improvement and approval of the $750,000.00 mediated settlement agreement was premature and inappropriate
3. If the mediated settlement agreement reached by the parties is found to be a binding agreement, the Commission must still "consider its approval of the mediated settlement agreement pursuant to Rule 502(1) of the Workers' Compensation Rules, i.e., is the agreement "deemed fair and just and in the best interest of all parties." Lemly v. Colvard Oil, 157 N.C. App. 99, 103,577 S.E.2d 712, 715 (2003).
4. It has been argued that $750,000.00 is a very large amount of money for a settlement. However, the present value of Ms. Ross's temporary total disability benefits is approximately $365,000.00, which leaves a balance of $385,000.00. Pursuant to an existing order for payment of attendant care, Mr. Ross is being paid 16 hours per day at $10.00 per hour, or $58,400 per year. At this rate the balance of $385,000.00 only accounts for 6.5 years of attendant care. Therefore, the agreement was not reasonable when considering only the future TID and attendant care previously ordered.
The unreasonableness is further compounded when the known future medical needs are for her documented neck and back problems, the need for eye surgery, plastic surgery, possible knee surgery, possible glaucoma treatment and any possible complications that might arise are considered. The cost of this treatment could add thousands and tens of thousands of additional future medical cost which are not provided for in the agreement. In light of this, the funds provided in the mediated settlement agreement are clearly not reasonably sufficient to provide for Mrs. Ross' future monetary support and her attendant care costs alone.
Such unreasonableness is even more blatant when the other future medical care needs are added. Knowing that Mrs. Ross requires significant additional and ongoing medical care, Deputy Commissioner Garner committed reversible error by approving the Mediated Settlement Agreement when it was apparent from even a basic economic evaluation that the funds were insufficient to provide for her know medical needs. Therefore, his Order approving the agreement should be set aside as not being fair and reasonable and Mrs. Ross' benefits should be reinstated.
5. By its terms Carroll v. Living Centers Southeast, Inc.,157 N.C. App. 116, 577 S.E.2d 925 (2003) is distinguishable from the case at bar. Said the Court, "The sole issue presented is the number of days within which payment must be tendered pursuant to a compromise settlement agreement for it to be deemed timely and avoid being subject to a late payment penalty." Although the Court reasoned that there was no automatic right of review once a compromise settlement agreement has been approved at any level of the Industrial Commission, another basis for decision would be that the 15 days given for notice of appeal are not counted when no appeal is taken.
6. As a general matter of statutory construction, courts give deference to the interpretation of a statute by the state agency charged with administering a given statute. Winslow v. CarolinaConference Ass'n Of Seventh Day Adventists et al., 211 N.C. 571,191 S.E. 403 (1937); Deadwood, Inc. v. North Carolina Dept. ofRevenue, 557 S.E.2d 596 (2001).
7. Whether the full Commission conducts a hearing or reviews a cold record, N.C. Gen. Stat. § 97-85 places the ultimate fact-finding function with the Commission — not the hearing officer. It is the Commission that ultimately determines credibility, whether from a cold record or from live testimony.Adams vs. AVX Corp., 349 N.C. 676, 509 S.E.2d 411 (1998).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The Order Approving Compromise Settlement Agreement of Deputy Commissioner Edward Garner, Jr., filed herein on November 14, 2003 was improvidently entered and is hereby VACATED.
2. Defendants shall forthwith resume payments of compensation, including but not limited to medical compensation, pursuant to all existing Orders of the Industrial Commission in this matter and shall pay arrears in a lump sum with interest at 8 percent per year from September 13, 2003.
3. Defendants shall pay the costs.
This 24th day of June 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ PAMELA THORPE YOUNG COMMISSIONER